IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| Michelle Ryder Morris, )<br>　　　　　　　　Plaintiff, )<br>　vs. )<br>Carolyn W. Colvin,<br>Commissioner of Social Security,[1] )<br>　　　　　　　　Defendant. ) | Civil Action No. 6:12-2692-JFA-KFM<br><br>**REPORT OF MAGISTRATE JUDGE** |

　　　　　This case is before the court for a report and recommendation pursuant to Local Civil Rule 73.02(B)(2)(a) DSC, concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[2]

　　　　　The plaintiff brought this action pursuant to Section 205(g) of the Social Security Act, as amended (42 U.S.C. 405(g)) to obtain judicial review of a final decision of the Commissioner of Social Security denying her claim for disability insurance benefits under Title II of the Social Security Act.

**ADMINISTRATIVE PROCEEDINGS**

　　　　　The plaintiff filed an application for disability insurance benefits ("DIB") on March 26, 2009, alleging that she became unable to work on March 19, 2009.  The application was denied initially and on reconsideration by the Social Security Administration. On June 9, 2010, the plaintiff requested a hearing.  The administrative law judge ("ALJ"), before whom the plaintiff and G. Roy Sumpter, an impartial vocational expert, appeared on

---

[1]  Carolyn W. Colvin became the Acting Commissioner of the Social Security Administration on February 14, 2013.  Pursuant to Fed.R.Civ.P. 25(d), Colvin should be substituted for Michael J. Astrue as the defendant in this case.

[2]A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

March 23, 2011, considered the case *de novo*, and on May 25, 2011, found that the plaintiff was not under a disability as defined in the Social Security Act, as amended. The ALJ's finding became the final decision of the Commissioner of Social Security when the Appeals Council denied review on September 7, 2012. The plaintiff then filed this action for judicial review.

In making his determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the ALJ:

> (1)    The claimant meets the insured status requirements of the Social Security Act through December 31, 2013.
>
> (2)    The claimant has not engaged in substantial gainful activity since March19, 2009, the alleged onset date (20 C.F.R §§ 404.1571 *et seq*).
>
> (3)    The claimant has the following severe impairments: status post motor vehicle accident, with multiple fractures, depression, adjustment disorder, and post-traumatic stress disorder (20 C.F.R. § 404.1520(c)).
>
> (4)    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Pt. 404, Subpt. P, App. 1 (20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526).
>
> (5)    After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform sedentary work as defined in 20 C.F.R. § 404.1567(a), except that she can frequently stoop, occasionally climb ramps and stairs, balance, kneel, crouch, and crawl, and never climb ladders, ropes, and scaffolds. The claimant can concentrate, persist, and work at pace to do simple, routine, repetitive tasks, at level three reasoning per the Dictionary of Occupational

2

Titles, for two hours in an eight-hour workday. She can interact occasionally with the public and appropriately with co-workers and supervisors in a stable, routine setting.

(6)    The claimant is unable to perform any past relevant work (20 C.F.R. § 404.1565).

(7)    The claimant was born on September 13, 1974, and was 34 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date (20 C.F.R. § 404.1563).

(8)    The claimant has at least a high school education and is able to communicate in English (20 C.F.R. § 404.1564).

(9)    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 C.F.R. Pt. 404, Subpt. P, App. 2).

(10)    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 C.F.R. §§ 404.1569 and 404.1569(a)).

(11)    The claimant has not been under a disability, as defined in the Social Security Act, from March 19, 2009, through the date of this decision (20 C.F.R. § 404.1520(g)).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

## APPLICABLE LAW

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability."  42 U.S.C. § 423(a).  "Disability" is defined in 42 U.S.C. § 423(d)(1)(A) as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions.  An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment that equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment that prevents past relevant work, and (5) has an impairment that prevents him from doing substantial gainful employment.  20 C.F.R. §§ 404.1520, 416.920. If an individual is found not disabled at any step, further inquiry is unnecessary.  *Id.* §§ 404.1520(a)(4), 416.920(a)(4).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. SSR 82–62, 1982 WL 31386, at *3.  The plaintiff bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).  He must make a prima facie showing of disability by showing he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

4

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy which the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. See *Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). The phrase "supported by substantial evidence" is defined as :

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966) (citation omitted).

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings and that his conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## EVIDENCE PRESENTED

The plaintiff lives with her husband and two children.  She graduated from high school and worked as a certified nursing assistant for 15 years, but stopped working after a March 2009 car accident (Tr. 56-57, 202-627).  She spent 13 days in the hospital, including eight days in the ICU on a ventilator, and required multiple surgeries (Tr. 202-38).  Her injuries included right-sided rib fractures, a left acetabular fracture (the ball that fits into the hip socket), right tibia fracture, and a liver laceration/bruise (Tr. 221, 619).  Dr. Kyle J. Jeray treated her right tibial shaft fracture with an intramedullary nail.  The hip fracture was treated with open reduction and internal fixation (Tr. 237-38, 619).  The plaintiff was discharged to home with the use of a rolling walker, a reclining wheelchair, and a hospital bed.  She was instructed not to drive or do any heavy lifting or vigorous physical activity until cleared by her physician (Tr. 221).

By mid-April 2009, Dr. Jeray noted that the injuries had healed nicely and encouraged aggressive range of motion of the ankle and the left knee and beginning range of motion exercises of the left hip (Tr. 619).  The plaintiff received physical therapy on both legs at home from St. Francis Home Health Care from April 2-27, 2009 (Tr. 646-48, 677, 681-85).

On April 29, 2009, Dr. Benjamin M. Manning counseled the plaintiff that strenuous activity might injure her liver.  At this time, the plaintiff reported doing well and bearing weight on her legs (Tr. 722).  In June 2009, a radiograph showed the plaintiff's hip and leg had healed, she had full range of motion, and the pain was improving.  Dr. Jeray allowed her to begin full weight bearing as tolerated on her legs (Tr. 760, 762).

On June 29, 2009, the plaintiff was sent for a psychological evaluation by the Social Security Administration to Bruce A. Kofoed, Ph.D. (Tr. 723).  He observed that the plaintiff was moderately overweight and was quite tearful during the interview (Tr.721).  He noted she used a cane to walk short distances and used a wheelchair or electronic cart for

longer distances (Tr. 725; *see also* Tr. 71).  She had difficulty dressing herself, could not put on her shoes, and had not driven since the accident (Tr. 725).  His diagnostic impression was that she suffered from an adjustment disorder with depression, irritability, and anxiety along with a pain disorder (Tr. 725).  She said she had never received professional mental health care, but she reported depression and anxiety since the accident (Tr. 723-26).

In a July 2009 physical functional review, Dr. Seham El-Ibiary noted that the plaintiff's accident injuries were healing well, found no reason not to expect full recovery, and opined that the plaintiff should be capable of medium exertional work by March 2010 (Tr. 727-34).[3]

In a July 2009 psychiatric review, Dr. Larry Clanton, Ph.D., noted that the plaintiff's mental condition resulted from physical problems, there was no past or current specialized mental health treatment, and no reason to think her mental condition would not improve as her body healed (Tr. 747).  He found no severe mental impairments and no particular mental limitations (Tr. 735-48).

In an August 2009 follow-up with Dr. Jeray, it was noted that medication controlled the plaintiff's hip pain, and she was walking without a cane and reported no leg pain (Tr. 759).

In October 2009, the plaintiff reported to Dr. Jeray that she had significant groin and hip pain, but could control it with over-the-counter medication; she also said her knee pain had improved dramatically, and its range of motion was normal (Tr. 758).  She still walked with a cane.  Dr. Jeray noted that right tibia internal and external rotation

---

[3]  To be found disabled under the Act, a claimant bears the burden of showing that she has been unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

extremes triggered discomfort and pain. He also noticed degenerative arthritic changes in her hip (Tr. 758).

In November 2009, the plaintiff began treatment by Dr. Steven Freeman. She reported lower extremity numbness for which she was treated with Neurontin (Tr. 752). Dr. Freeman also diagnosed her with and treated her for post traumatic stress disorder, insomnia, and depression. Dr. Freeman based this diagnosis on the plaintiff's nightmares and flashbacks caused by the car wreck. He also diagnosed her with chronic arthritic pain (Tr. 751-55, 802-20, 822-901).

In March 2010, radiographs showed some early post-traumatic changes in the plaintiff's pelvis, but also that her right leg was fully healed; examination revealed only some limited range of motion in the plaintiff's hip. On March 16, 2010, Dr. Jeray noted that the plaintiff had been in another car wreck, was still using a cane, complained of fatigue and leg pain, and felt that she had taken several steps back. He discussed the possibility of removing the intramedullary nail to potentially reduce pain (Tr. 756-57).

In an April 2010 physical function review, Dr. Dale Van Slooten found that the plaintiff could lift 20 pounds occasionally, sit and stand each for six hours a day, and had some postural limitations (Tr. 773-79).

In a May 2010 psychiatric review, Dr. Xanthia Harkness concluded the plaintiff could do simple work and also observed that the plaintiff's self-reports were not consistent (Tr. 780-93). In a mental function review, Dr. Harkness concluded that the plaintiff was moderately limited in her ability to concentrate and follow detailed instructions, but otherwise suffered no restrictions (Tr. 794-96).

The plaintiff returned to Dr. Freeman in June 2010 complaining of malaise and fatigue, hurting all over, and left leg discomfort (Tr. 810).

In August 2010, the plaintiff saw Dr. Freeman for malaise and fatigue, but tests were normal and there was no sign of sleep disorders (Tr. 809). In October 2010, the

plaintiff saw Dr. Jeray and reported some knee pain, but x-rays showed no abnormality. Range of motion in her hip was normal (Tr. 798-99).

The plaintiff returned to Dr. Freeman in February 2011, complaining of mild pain after a fall, but an ultrasound was normal (Tr. 829-31). The doctor gave her a corticosteroid injection, but she still reported pain a week later (Tr. 828). On February 5, 2011, Dr. Freeman opined that the plaintiff could sit two hours at one time, walk one hour at one time, and not stand for any length of time. He determined she required frequent positions changes throughout the day. He stated she could frequently lift up to ten pounds but should never lift any weight over ten pounds. Although she could use her right and left hands for repetitive actions, she could never use her feet for repetitive movements as in pushing and pulling of leg controls (Tr. 819). He opined she could occasionally bend and frequently reach but could never squat, crawl, or climb (Tr. 820). He further determined she should be restricted from unprotected heights, moving machinery, exposure to marked changes in temperature or humidity, and exposure to dust, fumes, and gases (Tr. 820). He also prescribed her with the use of a cane (Tr. 822).

In March 2011, MRIs of the plaintiff's brain and cervical spine were normal (Tr. 892-93). In April 2011, the plaintiff reported doing well, medication controlled her hip pain, and she was deferring hip surgery (Tr. 889).

In an April 4, 2011, letter, Dr. Freeman wrote that the plaintiff's arthritis would result in moderate to severe pain and that walking would grow more difficult. He concluded that given the level of residual arthritic pain and neuropathic pain associated with the major bone fractures and nerve injury sustained in the accident it would be difficult for the plaintiff to be employed in any occupation (Tr. 824).

At a June 2011 follow-up with Ellen C. Young, P.A., the plaintiff reported some leg pain and said she was unable to walk much, despite her orthopedist's encouragement to do so (Tr. 886). At an October 2011 follow-up, the plaintiff reported a few days of

9

abdominal pain and some hip pain she associated with colder weather. The plaintiff reported that she was not taking any medication for the pain (Tr. 874). The plaintiff was prescribed Mobic for osteoarthritis (Tr. 877). The plaintiff also presented with depression and anxiety. It was noted that the plaintiff had unusual stress and depression "at times" (Tr. 886). In February 2012, the plaintiff denied depression, anxiety, and panic attacks (Tr. 871). She complained of sinus congestion and hip pain. She was prescribed new pain medication, and exercise was recommended (Tr. 851-54,  870-71).

In March 2012, the plaintiff complained of intermittent gastroesophageal reflux ("GERD") and hip pain (Tr. 847). Ultrasound revealed a possible hernia and a normal gall bladder (Tr. 844-45). In June 2012, the plaintiff reported increased pain in her left leg; Dr. Freeman diagnosed hyperlipidemia and mild hypertension, prescribed Prozac as an appetite suppressant (not an antidepressant), and advised the plaintiff to exercise (Tr. 834-37).

At the hearing in March 2011, the plaintiff complained of "foot-drop" on her left side. She testified that this causes her problems with standing and balance. She also stated that the medication (Neurontin and Lortab) makes her tired and sleepy so that she finds it difficult to sit up throughout the day (Tr. 57-58). The plaintiff stated that during a typical day she can sit about two hours but needs to move and switch positions to remain comfortable (Tr. 50). She can stand about two hours in an eight hour day. She can walk for less than a mile during an eight hour day. She can lift and carry less than ten pounds, finds it uncomfortable to bend and stoop, and cannot crouch, kneel or crawl (Tr. 61)

After she awakens at 7:00 or 7:30 a.m., the plaintiff testified that she sits down to get dressed. (Tr. 63, 68). When she does not feel like getting dressed, she stays in her pajamas. The plaintiff spends most of the day on the couch. Her husband prepares all of her meals and gives her medication. Because of the medication, she sleeps about six or seven hours per day (Tr. 63) She watches television two to three hours per day (Tr. 70)

10

The plaintiff's fatigue and tiredness cause her to lose focus throughout the day, and she "cannot think straight" (Tr. 63). She added that her obesity limits her ability to walk (Tr. 66-67). She said she takes anti-depressants, but she does not see a mental health specialist (Tr. 62). The plaintiff testified that she is about 5'3" tall and weighs about 210 pounds (Tr. 66).

## ANALYSIS

The plaintiff was 34 years old on the alleged disability onset date and 36 years old on the date of the ALJ's decision. She has a high school education and past relevant work experience as a certified nursing assistant (Tr. 57). As set forth above, the ALJ found that the plaintiff's status post motor vehicle accident, with multiple fractures, depression, adjustment disorder, and post-traumatic stress disorder were severe impairments. The ALJ further determined that the plaintiff could perform sedentary work as defined in 20 C.F.R. § 404.1567(a), except that she can frequently stoop, occasionally climb ramps and stairs, balance, kneel, crouch, and crawl, and never climb ladders, ropes, and scaffolds. The ALJ further found that the claimant can concentrate, persist, and work at pace to do simple, routine, repetitive tasks, at level three reasoning per the Dictionary of Occupational Titles, for two hours in an eight-hour workday. She can interact occasionally with the public and appropriately with co-workers and supervisors, in a stable, routine setting. The plaintiff argues the ALJ erred in (1) failing to find her disabled under Listing § 1.00Q - Effects of Obesity; (2) failing to assign controlling weight to her treating physician's opinions; (3) failing to make adequate credibility findings with regard to her testimony; and (4) mischaracterizing and misstating the record.

### *Obesity*

The plaintiff argues that the ALJ erred in failing to find her disabled under Listing 1.00(Q), which is a paragraph in the musculoskeletal listings outlining the potential

11

effects obesity has in causing or contributing to impairments of the musculoskeletal system.

Listing 1.00(Q) states:

> *Effects of Obesity*. Obesity is a medically determinable impairment that is often associated with disturbance of the musculoskeletal system, and disturbance of this system can be a major cause of disability in individuals with obesity. The combined effects of obesity with musculoskeletal impairments can be greater than the effects of each of the impairments considered separately. Therefore, when determining whether an individual with obesity has a listing-level impairment or combination of impairments, and when assessing a claim at other steps of the sequential evaluation process, including when assessing an individual's residual functional capacity, adjudicators must consider any additional and cumulative effects of obesity.

20 C.F.R. Part 404, Subpart P, Appendix 1, § 1.00(Q).

The plaintiff correctly cites Listing 1.00(Q) for the proposition that obesity is a medically determinable impairment (pl. brief at 9); however, it is not a listed impairment. Rather, obesity is considered only in combination with other impairments.  Social Security Ruling ("SSR") 02-1p recognizes that obesity may be a factor in both "meets" and "equals" determinations at step three of the sequential evaluation process.  The Ruling states:

> Because there is no listing for obesity, we will find that an individual with obesity "meets" the requirements of a listing if he or she has another impairment that, by itself, meets the requirements of a listing. We will also find that a listing is met if there is an impairment that, in combination with obesity, meets the requirements of a listing. For example, obesity may increase the severity of coexisting or related impairments to the extent that the combination of impairments meets the requirements of a listing. This is especially true of musculoskeletal, respiratory, and cardiovascular impairments. It may also be true for other coexisting or related impairments, including mental disorders.

SSR 02-1p, 2000 WL 628049, at *5.  The Ruling further recognizes that obesity can cause limitations of function in sitting, standing, walking, lifting, carrying, pushing, pulling, climbing, balancing, stooping, crouching, manipulating, as well as the ability to tolerate extreme heat,

12

humidity, or hazards. *Id.* at *6.  These issues must be considered in assessing a claimant's

residual functional capacity ("RFC"). *Id.*  The Ruling states that "individuals with obesity may

have problems with the ability to sustain a function over time" and that "[i]n cases involving

obesity, fatigue may affect the individual's physical and mental ability to sustain work

activity." *Id.*  The Ruling also states:

> The combined effects of obesity with other impairments may be
> greater than might be expected without obesity. For example,
> someone with obesity and arthritis affecting a weight-bearing
> joint may have more pain and limitation than might be expected
> from the arthritis alone.

*Id.*  Further, "[a]s with any other impairment, we will explain how we reached our

conclusions on whether obesity caused any physical or mental limitations." *Id.* at *7.

As argued by the Commissioner, while the ALJ did not specifically mention

obesity in his decision, he specifically considered the musculoskeletal listings that would

have been affected by the plaintiff's obesity, including Listings 1.02, "Major dysfunction of

a joint(s) (due to any cause)," and 1.03, "Reconstructive surgery or surgical arthrodesis of

a major weight-bearing joint" (Tr. 17). 20 C.F.R. Pt. 404, Subpt. P, App. 1 §§ 1.02, 1.03.

The plaintiff testified at the hearing that obesity limited her movement (Tr. 66-67), which

was made difficult due to alleged joint pain.  Thus, the ALJ evaluated the relevant listings.

Furthermore, it is the plaintiff's burden to show that she meets a listing, and she has failed

to explain why she meets the criteria of any particular listing (pl. brief at 9-10). *See Pass v.

Chater*, 65 F.3d 1200, 1203 (4th Cir.1995) ("The applicant bears the burden of production

and proof during the first four steps of the inquiry.").  Moreover, the ALJ relied on opinions

by Drs. El-Ibiary, Van Slooten, and Harkness, each of whom concluded the plaintiff did not

meet any listings (Tr. 20-21, 727-34, 773-79, 780-93). *See Skarbek v. Barnhart*, 390 F.3d

500, 504 (7th Cir.2004) (finding harmless error where the ALJ did not address the claimant's

obesity but did adopt the limitations suggested by the specialists and reviewing physicians, who were aware of the claimant's obesity).

The plaintiff offers no argument specifying what limitations resulted from her obesity (pl. brief 9-10).  At the hearing, the ALJ asked the plaintiff how much she weighed and whether her weight limited her in any way (Tr. 66).  The plaintiff said her weight limited her ability to "walk and get around", but did not elaborate or claim that it disabled her (Tr. 66-67).  The ALJ found that the plaintiff was limited to sedentary work in his RFC finding, thus accounting for her obesity at the latter steps of the sequential evaluation process.  As noted by the Commissioner, the plaintiff never mentioned obesity at any other point in the administrative process (e.g., Tr. 7, 58, 63, 145, 153-60, 183).  Thus, she may not now challenge the failure of the ALJ to consider it. *See West v. Astrue*, No. 8:10-1442-DCN-JDA, 2011 WL 4527355 (D.S.C. June 6, 2011) ("Plaintiff never claimed obesity as a basis for her claims of disability . . . and, therefore, is now estopped from challenging the failure of the ALJ to consider it as such.") (citations omitted), *R&R adopted by* 2011 WL 4482494 (Sept. 27, 2011).

Based upon the foregoing, any error resulting from the ALJ's failure to explicitly consider the plaintiff's obesity is harmless. *Elder v. Astrue*, No. 3:09–2365-JRM, 2010 WL 3980105, at *9 (D.S.C. Oct. 8, 2010) ("As neither her medical records, nor her own statements, provide [evidence of the effect on her functioning or ability to work resulting from] her obesity, any failure of the ALJ to explicitly address [the claimant]'s obesity is only harmless error.").

### Medical Opinions

The plaintiff next argues that the ALJ erred by failing to give controlling weight to the opinions of treating physician Dr. Freeman.  The regulations require that all medical opinions in a case be considered, 20 C.F.R. § 404.1527(b), and, unless a treating source's opinion is given controlling weight, weighed according to the following non-exclusive list:

14

(1)  the length of the treatment relationship and the frequency of the examinations; (2)  the nature and extent of the treatment relationship; (3)  the evidence with which the physician supports his opinion; (4)  the consistency of the opinion; and (5)  whether the physician is a specialist in the area in which he is rendering an opinion. 20 C.F.R. § 404.1527(d)(2)-(5). *See also Johnson v. Barnhart*, 434 F.3d 650, 654 (4th Cir. 2005).  However, statements that a patient is "disabled," "unable to work," meets the listing requirements, or similar assertions are not medical opinions.    These are administrative findings reserved for the Commissioner's determination. SSR 96-5p, 1996 WL 374183, at *5.

The opinion of a treating physician is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case. *See* 20 C.F.R. § 404.1527(c)(2); *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001).  Social Security Ruling 96-2p requires that an ALJ give specific reasons for the weight given to a treating physician's medical opinion. 1996 WL 374188, at *5.  As stated in Ruling 96-2p:

> [A] finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected.  Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in [20 C.F.R. § 416.927].  In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

*Id.* at *4.

On February 5, 2011, Dr. Freeman opined that the plaintiff could sit two hours at one time, walk one hour at one time, and not stand for any length of time.  He determined the plaintiff required frequent positions changes throughout the day.  He stated she could frequently lift up to ten pounds but should never lift any weight over ten pounds.  Although

15

she could use her right and left hands for repetitive actions, she could never use her feet for repetitive movements as in pushing and pulling of leg controls (Tr. 819). He opined she could occasionally bend and frequently reach but could never squat, crawl, or climb (Tr. 820). He further determined she should be restricted from unprotected heights, moving machinery, exposure to marked changes in temperature or humidity, and exposure to dust, fumes, and gases (Tr. 820). He also prescribed her with the use of a cane (Tr. 822). In an April 4, 2011, letter, Dr. Freeman wrote that the plaintiff's arthritis would result in moderate to severe pain and that walking would grow more difficult. He concluded that given the level of residual arthritic pain and neuropathic pain associated with the major bone fractures and nerve injury sustained in the accident it would be difficult for the plaintiff to be employed in any occupation (Tr. 824).

The ALJ rejected Dr. Freeman's February 2011 opinion, noting that it was (1) inconsistent with the treatment notes, (2) inconsistent with the longitudinal record, (3) contradicted by the other medical opinions, and (4) seemed overly sympathetic (Tr. 21). As for Dr. Freeman's April 2011 opinion, the ALJ considered it as to the severity and limiting nature of the plaintiff's impairments, but disregarded its conclusion that the plaintiff was disabled (*id.*).

The plaintiff argues that the ALJ failed to provide an explanation for why some evidence was accepted while other evidence was rejected (pl. brief at 7). Specifically, she alleges the ALJ did not properly consider Dr. Freeman's notes showing "continuous and consistent reports of pain and psychological overlay" (*id.*). However, an ALJ may discount opinions based mainly on subjective self-reports. *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001). Moreover, the ALJ did consider Dr. Freeman's April 2011 opinion as to the severity and limiting nature of the plaintiff's symptoms and accorded less weight to Drs. El-Ibiary and Van Slooten's opinions due to the plaintiff's subjective symptoms (Tr. 20).

The ALJ noted that objective clinical evidence did not support Dr. Freeman's opined limitations (Tr. 21). Dr. Freeman's treatment records showed that the plaintiff's accident injuries had mostly healed, and clinical exams and radiographs were almost entirely normal (Tr. 19-20, 619, 722, 756, 759-60, 798-99). In addition, the ALJ noted that the opinions of Drs. El-Ibiary and Van Slooten directly contradicted Dr. Freeman's opinions (Tr. 21, 727-34, 773-79, 819-20, 824). Dr. El-Ibiary concluded that the plaintiff could perform a full range of medium work with no other physical restrictions (Tr. 20, 727-34), and Dr. Van Slooten concluded that the plaintiff could stand, walk, and sit for six hours each in a workday (Tr. 20, 773).

Furthermore, as argued by the Commissioner, the plaintiff has failed to show how assigning additional weight to Dr. Freeman's opinions would change the case's outcome, as she must for remand. *See Shinseki v. Sanders*, 556 U.S. 396, 409 (2009) ("[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination."); *Marshall v. Astrue*, No. 8:11-cv-2806, 2013 WL 1194764, at *5 (D.S.C. March 21, 2013) (finding harmless error where the plaintiff did not show "that she was prejudiced by the failure by the ALJ to explicitly discuss the employer's answers to the questionnaire."). The ALJ specifically noted in his decision that at the hearing the plaintiff's counsel asked the vocational expert a hypothetical question that included Dr. Freeman's opined limitations, and the vocational expert testified that the plaintiff could nonetheless perform the sedentary jobs that he had previously identified (Tr. 21, 79-80, 819-20). This hypothetical provided as follows:

> A: Okay. I'm going to assume, and if I'm wrong, please let me know. I am going to assume that she can work two hours, that will take the two hours sitting. She then has a break, which will allow her to walk 15 minutes. She could then sit for another two hours, have lunch, which she'd be walking, and the same thing

17

for the afternoon. Sit two hours, have a break, walk, and then sit the last two hours and then she's on her way home.

Q: That's –

A: That's the intention?

Q: That is a reasonable interpretation.

A: Okay. In that particular case, I believe that the table worker and the assembler would fit your hypothetical. The surveillance systems monitor, I think also would fit your hypothetical.

(Tr. 79-80).  As a result, even if the ALJ had fully adopted Dr. Freeman's prescribed limitations, the plaintiff would still have been found not disabled at step five.  As argued by the Commissioner, any error in discounting the opinion had no effect on the case's outcome, and thus did not prejudice the plaintiff.

The plaintiff also alleges that the ALJ's comment that the opinions were "overly sympathetic" was unsupported (pl. brief at 7).  However, the plaintiff does not show that this alleged error prejudiced her, as she must for remand.  Even if this factor were omitted, Dr. Freeman's opinions would still not merit controlling weight given the ALJ's finding that the opinions were inconsistent with Dr. Freeman's treating notes and other evidence and were contradicted by the opinions of the consulting physicians.

The plaintiff next argues that the ALJ erred by ignoring Dr. Freeman's finding that it would be difficult for the plaintiff to be employed in any occupation because of her major bone fractures and nerve injury (pl. brief at 8; *see* Tr. 21, 824).  The plaintiff acknowledges that, under the regulations, the question of whether a claimant meets the statutory definition of disability is reserved to the Commissioner (*id.*). 20 C.F.R. § 404.1527(d). However, the plaintiff argues that the ALJ violated due process by considering the opinions of non-examining State agency physicians Drs. El-Ibiary, Van Slooten, and

18

Harkness (pl. brief at 8; *see* Tr. 20-21). However, the ALJ was required to "consider findings and other opinions of State agency medical and psychological consultants . . ., except for the ultimate determination about whether your are disabled." 20 C.F.R. § 404.1527(e)(2)(i). In addition, an ALJ may rely on non-examining physicians' opinions if they are consistent with the record, as they were in the present case. *Gordon v. Schweiker*, 725 F.2d 231, 235 (4th Cir. 1984) ("[T]he testimony of a non-examining, non-treating physician should be discounted and is not substantial evidence when totally contradicted by other evidence in the record. . . . [W]e have also ruled that the testimony of a non-examining physician can be relied upon when it is consistent with the record.") (citations omitted). Also, Fourth Circuit cases "clearly contemplate [that treating physician] opinions may be rejected in particular cases in deference to conflicting opinions of non-treating physicians." *Campbell v. Bowen*, 800 F.2d 1247, 1250 (4th Cir. 1986). As discussed above, the ALJ thoroughly discussed Dr. Freeman's opinions and explained why he discounted them (Tr. 21). Moreover, the ALJ did not fully accept the non-examining opinions, but discounted them partially in favor of the plaintiff's testimony (Tr. 20).

Based upon the foregoing, this allegation of error is without merit.

### Credibility

The plaintiff argues that the ALJ erred in failing to make adequate credibility findings regarding her testimony. The Fourth Circuit Court of Appeals has stated as follows with regard to the analysis of a claimant's subjective complaints:

> [T]he determination of whether a person is disabled by pain or other symptoms is a two-step process. First, there must be objective medical evidence showing the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged. . . . It is only after a claimant has met her threshold obligation of showing by objective medical evidence a medical impairment reasonably likely to cause the pain claimed, that the intensity

19

> and persistence of the claimant's pain, and the extent to which
> it affects her ability to work, must be evaluated.

*Craig v. Chater*, 76 F.3d 585, 593, 595 (4th Cir. 1996). In *Hines v. Barnhart*, 453 F.3d 559 (4th Cir. 2006), a Fourth Circuit Court of Appeals panel held, "Having met his threshold obligation of showing by objective medical evidence a condition reasonably likely to cause the pain claimed, [the claimant] was entitled to rely exclusively on subjective evidence to prove the second part of the test, i.e., that his pain [was] so continuous and/or severe that it prevent[ed] him from working a full eight-hour day." 453 F.3d at 565. However, the court in *Hines* also acknowledged that "'[o]bjective medical evidence of pain, its intensity or degree (i.e., manifestations of the functional effects of pain such as deteriorating nerve or muscle tissue, muscle spasm, or sensory or motor disruption), if available should be obtained and considered.'" *Id.* at 564 (quoting SSR 90-1p, 1990 WL 300812).

> The court further acknowledged:
>
> > While objective evidence is not mandatory at the second step of the test, "[t]his is not to say, however, that objective medical evidence and other objective evidence are not crucial to evaluating the intensity and persistence of a claimant's pain and the extent to which it impairs her ability to work. They most certainly are. Although a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges she suffers."

*Id*. at 565 n.3 (quoting *Craig*, 76 F.3d at 595). *See Johnson v. Barnhart*, 434 F.3d 650, 658 (4th Cir. 2005); 20 C.F.R. § 404.1529(c)(2) ("We must always attempt to obtain objective medical evidence and, when it is obtained, we will consider it in reaching a conclusion as to whether you are disabled. However, we will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work solely because the available objective medical evidence does not

substantiate your statements."); SSR 96-7p, 1996 WL 374186, at *6 ("[T]he absence of objective medical evidence supporting an individual's statements about the intensity and persistence of pain or other symptoms is only one factor that the adjudicator must consider in assessing an individual's credibility and must be considered in the context of all the evidence.").

A claimant's symptoms, including pain, are considered to diminish his capacity to work to the extent that alleged functional limitations are reasonably consistent with objective medical evidence and other evidence. 20 C.F.R. §§ 404.1529(c)(4) and 416.929(c)(4). Furthermore, "a formalistic factor-by-factor recitation of the evidence" is unnecessary as long as the ALJ "sets forth the specific evidence [he] relies on in evaluating the claimant's credibility." *White v. Massanari*, 271 F.3d 1256, 1261 (10th Cir. 2001). Social Security Ruling 96-7p states that the ALJ's decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record." 1996 WL 374186, at *4. Furthermore, it "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and reasons for that weight." *Id.*

The factors to be considered by an ALJ when assessing the credibility of an individual's statements include the following:

(1)    the individual's daily activities;

(2)    the location, duration, frequency, and intensity of the individual's pain or other symptoms;

(3)    factors that precipitate and aggravate the symptoms;

(4)    the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

(5)    treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

(6)    any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying

21

flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

(7)    any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

*Id.* at *3.  *See* 20 C.F.R. §§ 404.1529(c), 416.929(c).

The ALJ first concluded that the plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms (Tr. 19).  However, the ALJ next concluded that the plaintiff was not fully credible with respect to the severity of the symptoms (*id.*)  The ALJ noted, among other things: (1)  clinical evidence did not support the disabling limitations that the plaintiff alleged (Tr. 19-20); (2)  the plaintiff alleged disabling mental limitations, but only rarely reported mental symptoms (Tr. 20; *see* Tr. 752, 809, 886); (3)  the plaintiff never sought specialized mental health treatment (Tr. 20); and (4)  several medical opinions contradicted the plaintiff's alleged limitations (Tr. 20-21; *see* Tr. 60-61, 727-34, 773-79, 780-93).

The plaintiff first argues that the ALJ improperly considered her failure to seek specialized mental health treatment (pl. brief at 12). However, failure to seek treatment for allegedly disabling conditions is probative of a claimant's credibility. *Mickles v. Shalala*, 29 F.3d 918, 930 (4th Cir. 1994).  The plaintiff reported mental symptoms to Dr. Freeman only three times between November 2009 and June 2011 (Tr. 752, 809, 886), and she never pursued treatment with a mental health practitioner. Viewed in light of her allegations, the ALJ justifiably found that these facts reduced her credibility.

The plaintiff next argues that certain boilerplate language in the ALJ's decision requires remand (pl. brief at 14-15). The plaintiff cites case law from the Seventh and Tenth Circuits in support of her argument that "[t]he habitual use of such boilerplate language shows that the ALJ is simply going through the motions in deciding SSA cases and is not adequately evaluating the testimony of the claimants before him" (*id.* at 14) (citing *Bjornson v. Astrue*, 671 F.3d 640, 645 (7th Cir. 2012) (" 'Such boilerplate language fails to inform us

22

in a meaningful, reviewable way of the specific evidence the ALJ considered in determining that claimant's complaints were not credible.' ") (quoting *Hardman v. Barnhart*, 362 F.3d 676, 679 (10th Cir. 2004)). While the ALJ here did use some boilerplate language in the decision denying the plaintiff's claim, the ALJ gave specific reasons to support his credibility finding, as discussed above. *See Craven v. Astrue*, No. 9:11–cv–01674-RBH, 2013 WL 1282022, at *5 (D.S.C. Mar. 26, 2013) ("The Court is mindful of the boilerplate language used by the ALJ, but the deference this Court must give to the Commissioner requires that it take the ALJ's findings, as long as they are supported by substantial evidence, at face value."). Accordingly, this argument is without merit.

Finally, the plaintiff argues that the ALJ erred by not assigning her "substantial credibility" due to her work record (pl. brief at 15-16) (citing *Northcutt v. Califano*, 581 F.2d 164, 166 (8th Cir. 1978)). However, while a plaintiff's work history may be a factor supporting credibility, it is not dispositive. *See* SSR 96–7p, 1996 WL 374186, at *5 (finding that a credibility assessment "must be based on consideration of all the evidence in the case record," which "includes, but is not limited to" a claimant's "prior work record and efforts to work"). Because a claimant's work history is not a controlling factor in assessing credibility and the ALJ offered several reasons for discounting the plaintiff's credibility, the undersigned concludes that the ALJ did not err in failing to assign her "substantial credibility" due to her work record. To the extent the ALJ erred in failing to discuss the plaintiff's work history in his credibility assessment, the undersigned recommends finding that any such error was harmless as the ALJ cited several factors in his credibility analysis, and adding this single factor would not have changed the outcome. *See Jones v. Colvin*, No. 1:12-2894-TMC, 2013 WL 5883382, at *12 (D.S.C. Oct. 30, 2013) (finding ALJ did not err in failing to assign great weight to claimant's work history).

***Residual Functional Capacity***

Lastly, the plaintiff objects to the finding that she can do sedentary work, alleging the ALJ overlooked or mischaracterized evidence (pl. brief at 10-11). She cites treatment records from the year after her car accident and asserts that the ALJ mistakenly considered that her surgical wounds healed, radiographs found little or no sign of abnormalities, and her pain and range of motion improved. As argued by the Commissioner, there is no doubt that the plaintiff was seriously impaired in the weeks after her accident (e.g., Tr. 202-38). However, impairments must last, or be expected to last, at least 12 months to qualify as disabling. 42 U.S.C. § 423(d)(1)(A). The plaintiff cites March and April 2009 medical records documenting her right tibial fracture, rib fractures, and other accident trauma (pl. brief at 11 (citing Tr. 202-627)). She also cites October 2009 findings, six months after the accident (*id.* (citing Tr. 758)). The plaintiff also cites a March 2010 treatment note, one year post-accident, in which the plaintiff complained of fatigue and leg pain (*id.* at 11-12 (citing 756-57)), and an October 2010 treatment note in which Dr. Jeray noted the plaintiff complained of left leg neuropathic pain and right knee pain. However, the ALJ acknowledged these records from the year after her accident and noted that treatment notes showed steady healing (Tr. 19-20, 619, 722, 756, 759, 760, 798-99). Furthermore, with regard to the March and October 2010 treatment notes, the ALJ noted that examination showed the plaintiff's fractures and incision cites had completely healed (Tr. 20 (citing Tr. 756-57)), and she had full range of motion in her hip and right knee (*id.* (citing Tr. 798-99). Moreover, the RFC assessment accounted for her alleged difficulties by providing for sedentary work and other restrictions (Tr. 18, 20, 60-61).

The plaintiff further argues that the ALJ erred by considering her daily activities in his RFC analysis (pl. brief at 13). The ALJ noted that: (1) while the plaintiff had several close friendships, she testified that she had withdrawn somewhat since her injuries (Tr. 16, 724); (2) she was limited primarily by physical impairments in her daily life, not

24

mental impairments (Tr. 16, 725); (3) she had not driven much since her accident out of anxiety (Tr. 16, 725); (4) her daily activities included watching television, listening to the radio, reading books to her children, and talking on the phone to family and friends (Tr. 19, 68-75, 187); and (5) she used computer "very little" (Tr. 19, 73).  As argued by the Commissioner, while the ALJ discussed the plaintiff's daily activities in the RFC analysis, the decision relied more on medical records and opinion evidence, as the discussion shows (*see* Tr. 20, 18-21).

The plaintiff also briefly notes that she does no household chores (pl. brief at 13).  However, the ALJ did not say she did.  In fact, the ALJ noted that the plaintiff testified that her husband did the mopping, cleaning, and sweeping (Tr. 19, 69, 185).  Thus, the ALJ did not err on this point.  Furthermore, the ALJ limited the plaintiff to sedentary work in the RFC, thus accounting for any inability to perform sustained house cleaning, and consistent with the plaintiff's alleged limitations (Tr. 18).

The plaintiff cites *Marcus v. Califano*, 615 F.2d 23, 29 (2nd Cir. 1979), for the proposition that "all doubts should be resolved in [her] favor" (pl. brief at 16).  However, as argued by the Commissioner, the *Marcus* court was only commenting on the general policy behind the Act, not announcing a burden of proof legal standard. *Id*. at 29.  The plaintiff bears the burden of producing evidence and proving disability at steps one through four, *Pass v. Chater*, 65 F.3d 1200, 1203 (4th Cir. 1995), and she must demonstrate how her impairments affect her functioning. *See* 20 C.F.R. § 404.1512(c).  The standard of review is whether substantial evidence supports the ALJ's decision and whether the correct law was applied. *Pass*, 65 F.3d at 1202. Here, the undersigned finds that the ALJ did not err, and substantial evidence supports his RFC finding.

25

## CONCLUSION AND RECOMMENDATION

This court finds that the Commissioner's decision is based upon substantial evidence and free of legal error.  Now, therefore, based upon the foregoing,

IT IS RECOMMENDED that the Commissioner's decision be affirmed.

IT IS SO RECOMMENDED.

s/ Kevin F. McDonald<br>
United States Magistrate Judge

December 2, 2013
Greenville, South Carolina